Mary WILSON, Individually, and as the Administrator of the Estate of James Darryl Wilson, Deceased;  et al., Appellant,

v.

William G. PLEASANT, Jr., General Motors Corporation, Appellee.

No. 64S03–9506–CV–693.

Supreme Court of Indiana.

Dec. 28, 1995.

Opinion by Justice Selby Concurring in Part and Concurring in Result Jan. 11, 1996.

Rehearing Denied March 7, 1996.

James W. Myers, III, Valparaiso, David H. Knobel, Merrillville, for Appellant.

Daniel J. Harrigan, Bayliff, Harrigan, Cord & Maugans, P.C., Kokomo, for amicus curiae Indiana Trial Lawyers Association.

David M. Heilbron, Leslie G. Landau, McCutchen, Doyle, Brown & Enersen, San Francisco, California, Alex Dimitrief, Kirkland & Ellis, Chicago, Illinois, Eric L. Kirschner, Randall J. Nye, Beckman, Kelly & Smith, Hammond, Frank Galvin, Galvin, Stalhmack & Kirschner, Hammond, for Appellee.

**ON PETITION TO TRANSFER**

SULLIVAN, Justice.

We hold that the Federal National Traffic and Motor Vehicle Safety Act of 1966 ("Safety Act"),[1] and certain safety regulations promulgated under it, do not pre-empt a state common law tort claim of negligence based on failure to install an airbag.

---

1. 15 U.S.C. §§ 1381–1431 (1988). The current version of The Safety Act is found at 49 U.S.C. § 30101–30169 (1995), pursuant to a 1994 recodification of transportation provisions in the United States Code. We will cite to the prior codification used by the parties, the trial court, and the Court of Appeals in this case.

*Facts*

On November 10, 1988, James Wilson was driving a 1986 Chevrolet automobile manufactured by General Motors ("GM") when he was hit head on by an automobile driven by William Pleasant. Wilson, who was not wearing his seat belt at the time of the accident, died at the scene.

Wilson's estate (and various others, collectively known as "Wilson") brought suit against Pleasant and GM. Wilson alleged that GM was negligent in designing, manufacturing, and selling a vehicle that was not crashworthy because the vehicle did not contain an airbag passive restraint system.

In response, GM filed a motion for summary judgment, claiming that the Safety Act and certain safety regulations promulgated under it pre-empted Wilson's common law claims.

The trial court granted GM's motion for summary judgment. The Court of Appeals affirmed the trial court's decision and found that although the Safety Act did not expressly pre-empt a common law claim such as the one asserted in this case, it impliedly did so. *Wilson v. Pleasant* (1994), Ind.App., 645 N.E.2d 638.

## I

Congress passed the Safety Act in 1966 to "reduce traffic accidents and death and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381 (1988). Two provisions of the Safety Act are relevant to this case. First, the Safety Act contains a pre-emption clause in section 1392(d). The pre-emption clause states:

> Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard.

15 U.S.C. § 1392(d). In addition to the pre-emption clause, the Safety Act contains a state common law savings clause: "Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from liability under common law." 15 U.S.C. § 1397(k).

Pursuant to the authority granted in the Safety Act, the U.S. Secretary of Transportation promulgated Federal Motor Vehicle Safety Standard 208 ("Rule 208").[2] 49 C.F.R. § 571.208 S4.1.2.1–S4.1.2.3 (1994). Rule 208 gave the manufacturer of Wilson's 1986 automobile three possible choices for providing passenger crash protection. The choices were: "First option—frontal/angular automatic protection system.... Second option—head-on automatic protection system.... Third option—lap and shoulder belt protection system with belt warning." *Id.* An airbag system would have complied with the first or second option. The automobile Wilson was driving at the time of the accident was equipped with a manual seat belt system that fully complied with the third option.

## II

Under the Supremacy Clause of the United States Constitution, federal law is the supreme law of the land. U.S. Const. art. VI, cl. 2. While "the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest intent of Congress," *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947), *rev'd on other grounds* 331 U.S. 247, 67 S.Ct. 1160, 91 L.Ed. 1468 (1947), it has been settled since *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819), that state law that conflicts with federal law is "without effect." *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981). Congress's intent to pre-empt state law may be *express, i.e.,* "explicitly stated in the statute's language," or "*implied,*" *i.e.,* "implicitly contained in [the statute's] structure and purpose." *Jones v.*

---

**2.** Rule 208 has been amended frequently. Subsection 4.1.2, covering passenger cars manufactured on or after September 1, 1973, and before September 1, 1986, is at issue in this case.

*Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law, *see Pacific Gas & Electric Co. v. Energy Resources Conservation and Dev. Comm'n,* 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983).[3]

## III

■ We agree with the Court of Appeals that the Safety Act does not expressly preempt a state common law claim in this case. *Wilson,* 645 N.E.2d at 641. The pre-emption clause found in the Safety Act explicitly refers, with respect to "any motor vehicle or item of motor vehicle equipment," only to state "safety standard[s] applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the federal standard." 15 U.S.C. § 1392(d). In addition, the presence of the savings clause negates any notion of express preemption of state common law claims. Therefore, we find that the Safety Act does not expressly pre-empt a state common law claim in this case. *Accord, Pokorny v. Ford Motor Co.,* 902 F.2d 1116, 1121 (3d Cir.1990), *cert. denied,* 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990); *Taylor v. General Motors Corp.,* 875 F.2d 816, 825 (11th Cir.1989), *cert. denied* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *Wood v. General Motors Corp.,* 865 F.2d 395, 402 (1st Cir. 1988), *cert. denied* 494 U.S. 1065, 110 S.Ct.

1781, 108 L.Ed.2d 782 (1990). *See also Heath v. General Motors Corp.,* 756 F.Supp. 1144, 1146–47 (S.D.Ind.1991) (finding no express preemption; collecting cases).

## IV

General Motors argues that even if, and the Court of Appeals held that even though, the Safety Act does not expressly pre-empt the common law claim at issue, it impliedly does so in that the common law claim actually conflicts with the federal regulation. *Wilson,* 645 N.E.2d at 641. The clear weight of authority prior to 1992 supported General Motors's view that the Safety Act impliedly pre-empts state common law claims like the one asserted by Wilson. *See, e.g., Pokorny,* 902 F.2d 1116; *Kitts v. General Motors Corp.,* 875 F.2d 787 (10th Cir.1989), *cert. denied* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *Taylor,* 875 F.2d 816; and *Wood,* 865 F.2d 395.[4] We will return to these cases in *parts V and VI* of this opinion but first address the vitality of the concept of implied pre-emption in airbag cases following recent decisions of the United States Supreme Court, particularly *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), and *Freightliner Corp. v. Myrick,* —— U.S. ——, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995).

### A–1

*Cipollone* did not involve airbags or even auto safety. Rather, it involved common law claims made against cigarette manufacturers,

---

**3.** In addition to such implied pre-emption of state law due to an actual conflict with federal law (sometimes called "conflict pre-emption"), state law is also pre-empted if federal law so thoroughly occupies a legislative field " 'as to make reasonable the inference that Congress left no room for the States to supplement it.' " *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (quoting *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152). This latter branch of implied pre-emption is sometimes called "field pre-emption." There is no claim of field pre-emption in this case.

**4.** We feel constrained to say that while auto manufacturers generally prevailed on their implied pre-emption defenses in airbag cases prior to 1992, these cases did not necessarily result in complete victories for the defendants. In most

of them, the courts rejected the manufacturer's companion express pre-emption argument. In *Wood,* there is a lengthy and persuasive dissent. *Wood,* 865 F.2d at 419 (Selya, J., dissenting). In *Pokorny,* the Third Circuit, while affirming the district court's grant of summary judgment for the defendants on plaintiffs' airbag claim, nevertheless reinstated plaintiffs' claim that the automobile should have been equipped with protective netting on the windows. *Pokorny,* 902 F.2d at 1126. Finally, these cases are not uniform in their analysis of the problem. For example, *Pokorny* specifically rejected the *Wood* court's determination that Congress did not foresee design defects suits in 1966 and that therefore the savings clause should not be interpreted to preserve them. *Heath,* 756 F.Supp. at 1148. *See also, Gingold v. Audi–NSU–Auto Union, A.G.,* 389 Pa.Super. 328, 567 A.2d 312 (1989) (finding no express or implied pre-emption).

alleging responsibility for the death of smoker and lung cancer victim Rose Cipollone. The manufacturers defended on grounds that the common law claims were pre-empted by the terms of the Federal Cigarette Labeling and Advertising Act,[5] enacted in 1965 (the "1965 Act"), and its successor, the Public Health Cigarette Smoking Act of 1969 (the "1969 Act").

The Supreme Court began its analysis by setting forth basic principles of pre-emption—the Supremacy Clause; the presumption that state police powers are not superseded by federal law unless that is "the clear and manifest intent of Congress;"[6] and the definitions of express and implied pre-emption. The Court then noted that the Third Circuit Court of Appeals had conducted its analysis of the pre-emption clauses of the Acts by reading the statute as a whole. Rejecting this approach, the Supreme Court concluded that the pre-emptive scope of each of the two acts was "governed entirely by the express language of § 5 [the pre-emption clauses] of each Act"[7] for the following reason:

> When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a "reliable indicium of congressional intent with respect to state authority," *Malone v. White Motor Corp.*, 435 U.S. [497,] 505, [98 S.Ct. 1185, 1190, 55 L.Ed.2d 443,] there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation. *California Federal Savings & Loan Assn. v. Guerra*, 479 U.S. 272, 282 [107 S.Ct. 683, 690, 93 L.Ed.2d 613,] (1987) (opinion of MARSHALL, J.). Such reasoning is a variant of the familiar principle of *expressio unius est exclusio alterius:* Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that

---

5. 15 U.S.C. § 1334 (1982).

6. This presumption against pre-emption was a major point of contention between the two-justice minority lead by Justice Scalia and the seven-justice majority lead by Justice Stevens. While Justice Scalia's dissent argued that there was "no merit to this newly crafted doctrine of narrow construction," *Cipollone,* 505 U.S. at 544, 112 S.Ct. at 2632 (Scalia, J., dissenting), the Stevens majority opinion quotes the 1947 opinion of *Rice v. Santa Fe Elevator Corp.* to the effect that "the historic police powers of the State [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress." *Id.,* 505 U.S. at 516, 112 S.Ct. at 2617 (quoting *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152). Justice Blackmun supplied substantial additional authority for Justice Stevens' position in concurring in that part of the majority opinion. *Id.,* 505 U.S. at 531–34, 112 S.Ct. at 2625–26 (Blackmun, J., joined by Kennedy and Souter, J.J., concurring and dissenting). And in the next major pre-emption case following *Cipollone,* Justice White wrote for the entire court:

> In the interest of avoiding unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption. Thus, pre-emption will not lie unless it is "the clear and manifest purpose of Congress."

*CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 663, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993). We give special attention here to the presumption against pre-emption because we believe the emphasis given it by the Stevens and Blackmun opinions in *Cipollone* and the White opinion in *Easterwood* has greatly and appropriately influenced the thinking about pre-emption in post-*Cipollone* cases. *See, e.g., Myrick v. Freuhauf Corp.,* 13 F.3d 1516, 1527 (11th Cir.1994), *aff'd sub nom. Freightliner Corp. v. Myrick,* —— U.S. ——, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995); *Hernandez–Gomez v. Leonardo,* 180 Ariz. 297, 305 n. 17, 884 P.2d 183, 191 n. 17 (1994), *cert. granted sub nom. Volkswagen of America, Inc. v. Hernandez–Gomez,* —— U.S. ——, 115 S.Ct. 1819, 131 L.Ed.2d 742 (1995) *and vacated and remanded in light of decision in Freightliner Corp. v. Myrick,* —— U.S. ——, 115 S.Ct. 1483, 131 L.Ed.2d 385; *Tebbetts v. Ford Motor Co.,* 665 A.2d 345, 346 (N.H.1995); *Attocknie v. Carpenter Mfg., Inc.,* 901 P.2d 221, 224 (Okla.Ct.App.1995); *Heiple v. C.R. Motors, Inc.,* 666 A.2d 1066, 1072 (Pa.Super.Ct.1995); *Alvarado v. Hyundai Motor Corp.,* 908 S.W.2d 243, 250 (Tex.Ct.App.1995); *Loulos v. Dick Smith Ford, Inc.,* 882 S.W.2d 149, 150 (Mo.Ct.App.1994).

7. Section 5(b) of the 1965 Act provided: "No statement relating to smoking and health should be required in the advertising of any cigarettes which packages are labeled in conformity with the provisions of this chapter."

Section 5(b) of the 1969 Act provided: "No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter."

reach are not pre-empted. In this case, the other provisions of the 1965 and 1969 Acts offer no cause to look beyond § 5 of each Act. Therefore, we need only identify the domain expressly pre-empted by each of those sections. As the 1965 and 1969 provisions differ substantially, we consider each in turn.

*Id.* at 517, 112 S.Ct. at 2618.

### A–2

A seven-member majority of the Supreme Court then found that common law claims were not pre-empted by § 5 of the 1965 Act.[8] And its analysis is instructive. The Court looked at the pre-emption provision and concluded that Congress had spoken "precisely and narrowly. . . . [O]n their face, these provisions merely prohibited state and federal rule-making bodies from mandating particular cautionary statements on cigarette labels (§ 5(a)) or in cigarette advertisements (§ 5(b))." *Id.* The Supreme Court went on to give five additional reasons why its finding of no preemption of state law damages actions was appropriate: (1) "[W]e must construe these provisions in light of the presumption against pre-emption of state police power regulations." *Id.;*[9] (2) "[T]he warning label required [by the Act] does not by its own effect foreclose additional obligations imposed under state law. That Congress requires a particular warning does not automatically pre-empt a regulatory field." *Id.;* (3) "[T]here is no general, inherent conflict between federal pre-emption of state warning requirements and the continued vitality of state common law damages actions." *Id.;*

(4) "This reading comports with the 1965 Act's statement of purpose." *Id.* at 519, 112 S.Ct. at 2619; and (5) "The regulatory context of the 1965 Act also supports such a reading." *Id.*

### B

In cases subsequent to *Cipollone*, several courts employed the language from *Cipollone* quoted in *part IV–A–1, supra,* and interpreted it to mean that because the Safety Act contains an express pre-emption clause, it is no longer necessary to consider implied pre-emption at all.[10] Two such cases are particularly illustrative.

In *Hernandez–Gomez v. Leonardo,* the plaintiff was involved in an automobile accident that left her a paraplegic. She alleged that the design of the car she was driving at the time of the accident failed to adequately protect her because, although the automobile's passive restraint system complied with Rule 208, the car was not crashworthy because it did not include a manual lap belt. The Arizona Supreme Court held that the Safety Act did not pre-empt this claim. *Hernandez–Gomez,* 180 Ariz. 297, 884 P.2d 183. The Court relied on the language in *Cipollone* to hold that an implied pre-emption analysis of the Safety Act was unnecessary, saying "courts should avoid debating implied pre-emption if the text of the statute addresses pre-emption and thus reliably identifies congressional intent." *Id.* at 302, 884 P.2d at 188.

In *Myrick v. Freuhauf,* the plaintiff contended that the absence of an antilock brak-

---

8. As to the pre-emptive effect of § 5 of the 1969 Act, a plurality of four justices found some claims pre-empted and some not, three justices found none of the claims pre-empted, and two justices found all the claims pre-empted. Because of the widely varying views of the justices on the pre-emptive effect of § 5 of the 1969 Act, we have not found their analyses of it as helpful.

9. See note 5, *supra.*

10. *See Myrick,* 13 F.3d 1516; *Hernandez–Gomez,* 180 Ariz. 297, 884 P.2d 183; *Tebbetts,* 665 A.2d 345; *Heiple,* 666 A.2d 1066; *Alvarado,* 908 S.W.2d 243; *Attocknie,* 901 P.2d 221; and *Loulos,* 882 S.W.2d 149. As discussed in note 6, *supra,* these courts also took into account the

*Cipollone* emphasis on the presumption against pre-emption.

There are also some post-*Cipollone* cases that continued to conduct an implied preemption analysis and held that no airbag claims were pre-empted. *See Hill v. General Motors Corp.,* No. 94–AR–0088–S (N.D.Ala. Nov. 15, 1995); *Beeman v. Lovelace, et al.,* No. CIV 94–1956–A (W.D.Okla. Nov. 2, 1995); *Dykema v. Volkswagenwerk,* 525 N.W.2d 754 (Wis.Ct.App.1994), cert. denied —— U.S. ——, 116 S.Ct. 60, 133 L.Ed.2d 23 (1995); *Miranda v. Fridman,* 276 N.J.Super. 20, 647 A.2d 167 (1994); *Boyle v. Chrysler Corp.,* 177 Wis.2d 207, 501 N.W.2d 865 (1993); *Marrs v. Ford Motor Co.,* 852 S.W.2d 570 (Tex.Ct.App.1993); and *Montag v. Honda Motor Co.,* 856 F.Supp. 574 (D.Colo.1994).

ing system in his tractor-trailer constituted a negligent design defect. *Myrick*, 13 F.3d 1516. The defendant contended that the same provisions of the Safety Act at issue in our case pre-empted state common law claims.[11] Like *Hernandez–Gomez*, the 11th Circuit also ruled for the plaintiff on the basis that *Cipollone* stood for the proposition that implied pre-emption cannot exist when Congress has included an express pre-emption clause in the statute.

### C

The U.S. Supreme Court granted *certiorari* in both *Myrick* and *Hernandez–Gomez*.[12] Writing for the Court in *Myrick*, the antilock braking system case, Justice Thomas first addressed the plaintiffs' argument that the Court "need not reach the conflict pre-emption issue at all" and dismissed as "without merit" the 11th Circuit's holding that, under *Cipollone*, "implied pre-emption cannot exist when Congress has chosen to include an express pre-emption clause in a statute." *Myrick*, —— U.S. at ——, 115 S.Ct. at 1487. Rather than establish any categorical rule in *Cipollone*, the *Myrick* court said, that case turned "on a familiar canon of statutory construction and on the absence of any reason to infer any broader pre-emption." *Id.* at ——, 115 S.Ct. at 1488. After quoting verbatim the passage from *Cipollone* quoted in *part IV–A–1, supra*, the *Myrick* court said:

> The fact that an express definition of the pre-emptive reach of a statute "implies"— *i.e.*, supports a reasonable inference—that Congress did not intend to pre-empt other matters does not mean that the express clause entirely forecloses any possibility of implied pre-emption. Indeed, just two paragraphs after the quoted passage in *Cipollone*, we engaged in a conflict pre-emption analysis of the Federal Cigarette Labeling and Advertising Act, 79 Stat. 282, as amended, 15 U.S.C. § 1331 *et seq.*, and found "no general, inherent conflict be-

tween federal preemption of state warning requirements and the continued vitality of state common law damages actions." 505 U.S. at 518, 112 S.Ct., at 2618. Our subsequent decisions have not read *Cipollone* to obviate the need for analysis of an individual statute's pre-emptive effects. See, *e.g.*, *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 673, n. 12, 113 S.Ct. 1732, 1742 n. 12, 123 L.Ed.2d 387 (1993) ("We reject petitioner's claim of implied 'conflict' pre-emption ... on the basis of the preceding analysis.") At best, *Cipollone* supports an inference that an express pre-emption clause forecloses implied pre-emption; it does not establish a rule.

—— U.S. at ——, 115 S.Ct. at 1488.

Having thus dismissed plaintiffs' argument that no implied pre-emption analysis was appropriate under the Safety Act because of the presence of an express pre-emption clause, the Supreme Court nevertheless agreed with the plaintiffs that summary judgment in favor of the defendants on grounds of implied conflict pre-emption was not appropriate. The Court indicated that there were two bases for finding implied conflict pre-emption: (1) where it is "impossible for a private party to comply with both state and federal requirements," *id.* at ——, 115 S.Ct. at 1487 (quoting *English v. General Electric Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 2274–75, 110 L.Ed.2d 65 (1990)); or (2) where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *id.* at ——, 115 S.Ct. at 1487 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

The Court made quick work of the pre-emption defense given that no federal safety standards were in effect which regulated the use of anti-lock brake systems on tractor-trailers. As such, it was not impossible for

---

11. While the statutory provisions are the same, obviously the crash protection regulations in Rule 208 do not apply to antilock braking systems. In a fact that would be dispositive when the case reached the Supreme Court, no Department of Transportation regulations regarding antilock braking systems for tractor-trailers were in effect when the accident in *Myrick* occurred.

12. The Court did not write an opinion in *Hernandez–Gomez,* but vacated and remanded to the Arizona Supreme Court for reconsideration in light of *Myrick.*

the defendants "to comply with both federal and state law because there [was] simply no federal standard to comply with." *Id.* at ———, 115 S.Ct. at 1488. Furthermore, since, in the absence of a promulgated safety standard, the Safety Act fails to address the need for anti-lock brake system devices at all on tractor-trailers, the Court had no basis for concluding that the "lawsuits frustrate 'the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at ———, 115 S.Ct. at 1488 (quoting *Hines*, 312 U.S. at 67, 61 S.Ct. at 404).

### D

Summarizing the current state of the law of implied pre-emption, we cannot help observing that *Myrick* did not overrule *Cipollone*. Rather, the Supreme Court held that interpretations of *Cipollone* to the effect that implied pre-emption cannot exist when Congress has chosen to include an express pre-emption clause were incorrect interpretations. Based on *Cipollone*, as elucidated in *Myrick*, we believe that the following steps are required to analyze properly a claim that implied conflict pre-emption bars a state common law damages claim.

■ First, if the federal statute at issue contains pre-emption language, we determine whether that provision *alone* provides a reliable indication of congressional intent with respect to its pre-emptive effect. We make that determination by employing canons of statutory construction and by examining the other provisions of the statute—and the statute as a whole—to see if they offer any cause to look beyond the express pre-emption language. If we find such a reliable indication of congressional intent and neither the application of the canons nor an examination of the other provisions of the statute suggests any reason to infer any different degree of preemption, then—but only then—is there no need to go beyond the "precise[ ] and nar-

row[ ]" reading of the pre-emption clause itself.[13] *See Cipollone* at 517–18, 112 S.Ct. at 2618.

■ Second, if we find that something more than a precise and narrow application of the language of the pre-emption clause is required, we must determine whether the state law in question is in actual conflict with federal law, *Myrick* at ———, 115 S.Ct. at 1487, *i.e.*, (1) whether it is impossible for a private party to comply with both state and federal requirements, or (2) whether the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Id.*

### V

■ Unlike the case before us today, neither *Cipollone* nor *Myrick* was an "airbag" case.[14] But the principles derived from those cases set forth in *part IV–D, supra,* help us resolve the airbag case. It is immediately obvious that the § 1392(d) pre-emption clause in the Safety Act, taken *alone*, does not provide a reliable indication of congressional intent with respect to its pre-emptive effect. The presence of the § 1397(k) savings clause in the statute—providing, as it does, that "compliance with any [federal regulation] issued under [the statute] does not exempt any person from liability under common law"—makes it very clear, we think, that the pre-emptive scope of the Safety Act is not governed entirely by the express language of the pre-emption clause. But, applying the principles enunciated in *Cipollone* and *Myrick*, we do believe that the pre-emption and savings clauses *together* foreclose any possibility of implied pre-emption with respect to state common law claims.

When the Supreme Court looked at the § 5(b) pre-emption clause of the 1965 Cigarette Act, it found that Congress spoke "precisely and narrowly," *Cipollone*, 505 U.S. at

---

13. And, as Justice Thomas notes in *Myrick*, even after the *Cipollone* court concluded that implied pre-emption analysis was not required under the cigarette advertising statutes, it went ahead and effectively conducted the implied pre-emption analysis anyway, utilizing the analysis outlined in *part IV–A–2, supra. Myrick,* —— U.S. at ——, 115 S.Ct. at 1488.

14. And while *Myrick* involved a claim of pre-emption under the same federal statute as the one before us in this case, the fact that no anti-lock braking system regulation had been promulgated thereunder for tractor-trailers meant that it was not necessary for the Supreme Court to consider the effect on the pre-emption clause of the savings clause.

518, 112 S.Ct. at 2618, when it specified that "[n]o statement relating to smoking and health shall be required in the advertising of any [properly labeled] cigarettes" and thereby "only prohibited state and federal rule-making bodies from mandating particular cautionary statements and did not pre-empt state law damages actions." *Id.*, 505 U.S. at 519–20, 112 S.Ct. at 2619. Similarly, when we look at the § 1392(d) pre-emption clause of the Safety Act, we see only a prohibition on state motor vehicle or motor vehicle equipment safety standards not identical to federal safety standards applicable to the same aspect of performance of the motor vehicle or item of motor vehicle equipment. And any doubt that might exist as to whether this language is narrow and precise enough to conclude that it merely prohibits state rule-making bodies from mandating particular safety standards or is broad and wide enough to prohibit state common law damage claims as well is dispelled by the presence of the § 1397(k) savings clause: "Compliance with any federal motor vehicle safety standard issued under this subchapter does not exempt any person from liability under common law." This language seems to us to be sufficiently precise to create "the reliable indicium of congressional intent with respect to state authority" necessary to render implied pre-emption analysis inapplicable. *Cipollone*, 505 U.S. at 517, 112 S.Ct. at 2618 (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 505, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978) and *California Fed. Sav. & Loan Assn. v. Guerra*, 479 U.S. 272, 282, 107 S.Ct. 683, 690, 93 L.Ed.2d 613 (1987) (opinion of Marshall, J.)).

Beyond the precise words of these provisions, we find, as did the Supreme Court in *Cipollone*, this reading is appropriate for several reasons. First, "we must construe these provisions in light of the presumption against the pre-emption of state police power regulation." *Cipollone*, 505 U.S. at 518, 112 S.Ct. at 2618; *Maryland v. Louisiana*, 451 U.S. at 746, 101 S.Ct. at 2129; *Rice v. Santa Fe Elevator Corp.*, 331 U.S. at 230, 67 S.Ct. at 1152. As discussed at length in footnote 6, *supra*, we believe *Cipollone*'s and *Easterwood*'s emphasis on this point raises this principle to fundamental importance in pre-emption analysis. Second, courts have recognized savings clauses such as § 1397(k) as preserving common law claims in the face of federal regulations. In *Cipollone*, for example, the Supreme Court found that a savings clause in the Comprehensive Smokeless Tobacco Health Education Act of 1986 [15] "preserved state law damages actions based on those products." 505 U.S. at 518, 112 S.Ct. at 2618. The savings clause in the National Manufactured Housing Construction and Safety Act, the language of which is identical to the savings clause in the Safety Act at issue here, has also been held to preserve common law claims. 42 U.S.C. § 5409(c) (1995); *Shorter v. Champion Home Builders*, 776 F.Supp. 333 (N.D.Ohio 1991).[16]

We believe the strongest argument against this view that the plain language of the § 1397(k) savings clause precludes implied pre-emption analysis was advanced in *Wood*. In that case, a majority of a First Circuit panel found that the statute "lack[ed] clear and express direction on the subject" of whether state design lawsuits were pre-

---

**15.** 15 U.S.C. § 4406: "Nothing in this chapter shall relieve any person from liability at common law or under State statutory law to any other person."

**16.** *See also Resolution Trust Corp. v. Cityfed Financial Corp.*, 57 F.3d 1231 (3d Cir.1995) (savings clause in Financial Institutions, Reform, Recovery, and Enforcement Act of 1989 preserves state and federal common law claims); *Cropwell Leasing Co. v. NMS, Inc.*, 5 F.3d 899 (5th Cir. 1993) (savings clause in Comprehensive Environmental Response Compensation and Liability Act preserves other claims, including general maritime claims); and *Dudley v. Business Express, Inc.*, 882 F.Supp. 199 (D.N.H.1994) (savings

clause in Airline Deregulation Act preserves state common law claims). *Contra, Carstensen v. Brunswick Corp.*, 49 F.3d 430 (8th Cir.1995) (Federal Boat Safety Act pre-empts state tort law claims despite savings clause in Act), *cert. denied* — U.S. ——, 116 S.Ct. 182, 133 L.Ed.2d 120 (1995); *Cleveland v. Beltman North American Co.*, 30 F.3d 373 (2nd Cir.1994) (Carmack Amendment to Interstate Commerce Act of 1887 pre-empts common law claim despite savings provision in Amendment), *cert. denied* — U.S. ——, 115 S.Ct. 901, 130 L.Ed.2d 785 (1995); and *Mattoon v. Pittsfield*, 980 F.2d 1 (1st Cir.1992) (Safe Water Drinking Act pre-empts common law nuisance claim despite existence of savings clause).

empted—thereby requiring implied pre-emption analysis. *Id.,* 865 F.2d at 402. The reason that the panel found the language of the § 1397(k) savings clause to be unclear on the subject was essentially that Congress in 1966 did not anticipate that there could ever be such a thing as a state tort action based on negligent design. And so if "Congress did not envisage this peculiar type of lawsuit," the panel found that Congress could not have meant to sanction what the court referred to as "the 'tension' between the FMVSS and state common law existing in the current situation." *Id.* at 403. We do not mean to slight the extensive treatment given this subject by the *Wood* majority when we disagree.

First and foremost, we emphasize that the *Wood* majority · ignored the presumption against pre-emption. Had it visited this subject following *Cipollone's* and *Easterwood's* reaffirmation of this important principle, *Cipollone,* 505 U.S. at 517–18, 112 S.Ct. at 2618; *Easterwood,* 507 U.S. at 663, 113 · S.Ct. at 1737, we do not believe it would have embarked on its extensive effort to find that Congress did not mean what it said.

Second, we simply cannot agree that design defect litigation was so unknown in 1966 that Congress would not have considered it to be part of common law when it first adopted the Safety Act. In general, we agree with the *Wood* dissent's analysis of the state of design defect tort law in 1966 and its conclusion that "Congress made no specific exception for products liability for design defects [in the Safety Act], and we disserve the proper performance of our role by carving such an exception against the grain of history." *Wood,* 865 F.2d at 422 (Selya, J., dissenting).

Furthermore, the principal argument that the *Wood* majority uses to establish that the § 1397(k) savings clause pre-dates the emergence of design defect litigation is that such causes of action were not recognized until the Eighth Circuit's decision in *Larsen v. General Motors Corp.,* 391 F.2d 495 (8th Cir.1968) (allowing the jury to decide whether a vehicle with a rigid steering linkage which caused severe injuries to the driver in a front-end collision was defectively designed), two years

after enactment of the Safety Act. But rarely does a new theory of a cause of action emerge *ab initio* from the appellate judge's pen; rather, it is conceived, written about, debated, and litigated at trial for many years before being briefed, argued, and opined upon on appellate review. And even the *Larsen* court addressed the relationship between the Safety Act's § 1392(d) pre-emption clause and § 1397(k) savings clause:

> It is apparent that the National Traffic Safety Act is intended to be supplementary of and in addition to the common law of negligence and product liability. The common law is not sterile or rigid and serves the best interests of society by adapting standards of conduct and responsibility that fairly meet the emerging and developing needs of our time. The common law standard of a duty to use reasonable care in light of all the circumstances can at least serve the needs of our society until the legislature imposes higher standards or the courts expand the doctrine of strict liability for tort. The Act is a salutary step in this direction and not an exemption from common law liability.

*Larsen,* 391 F.2d at 506 (quoted in *Wood,* 865 F.2d at 422 (Selya, J., dissenting)).

For these reasons, we hold that in the § 1397(k) savings clause of the Safety Act, Congress made an explicit statement that the kind of state common law claim made by plaintiff in this case is not pre-empted by the Safety Act or standards promulgated thereunder. And while fully subscribing—as we must—to *Myrick's* teaching that an express pre-emption clause does not as a rule foreclose implied pre-emption, for the reasons set forth above, we hold that the § 1397(k) pre-emption clause entirely forecloses any possibility of implied pre-emption in this case.

### VI

■ We recognize that the law is not settled in this area, however, and so conduct an implied pre-emption analysis despite holding that it is not required. And we conclude that, even if we go beyond a facial reading of the Safety Act's § 1392(d) pre-emption clause and the § 1397(k) savings clause and apply traditional implied conflict pre-emption

analysis, we do not find plaintiff's common law negligence claim pre-empted here.

## A

Under *Myrick* and *English v. General Electric Co.*, 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990), the Supreme Court has indicated that implied conflict pre-emption exists where "it is impossible for a private party to comply with both state and federal requirements." *Myrick*, — U.S. at —, 115 S.Ct. at 1487; *English*, 496 U.S. at 79, 110 S.Ct. at 2275. First, we conclude that there is no conflict between state common law in this case and the choices presented by Rule 208. Implied pre-emption occurs when it is physically impossible to comply with both state and federal law. *California Fed. Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 107 S.Ct. 683, 93 L.Ed.2d 613. The Court of Appeals held that the Safety Act impliedly pre-empted state common law in this case because a common law judgment would have the effect of forcing GM to comply with a *de facto* standard that conflicts with Rule 208. 645 N.E.2d at 641. We disagree.

We do acknowledge that in some cases, a common law judgment may be pre-empted due to a conflict with a federal law. However, we conclude that for there to be a conflict, state law—statutory, regulatory, or common—would have to mandate a passive restraint system *prohibited* by federal regulation. Assuming, *arguendo*, that Indiana common law requires airbags, there would be no conflict with Rule 208 because Rule 208 does not prohibit airbags—it only permits some other alternatives. We hold that there is no conflict between state common law in this case and the choices presented by Rule 208. *Accord, Heath v. General Motors Corp.*, 756 F.Supp. at 1147 (finding implied pre-emption on other grounds).

## B

Under *Myrick* and *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581, the Supreme Court has indicated that implied conflict pre-emption exists where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Myrick*, — U.S. at

—, 115 S.Ct. at 1487; *Hines*, 312 U.S. at 67, 61 S.Ct. at 404. To ascertain the full purposes and objectives of Congress, we examine the stated purposes and policies of the statute in general, the statutory language at issue in particular, both elucidated where possible by the statute's legislative history. *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (citing *FMC Corp. v. Holliday*, 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990)).

We believe that a finding of implied pre-emption would be inconsistent with the purpose of and policies underlying the Safety Act. It is clear that Congress, by enacting the Safety Act, intended to "reduce traffic accidents and deaths and injuries to persons relating from traffic accidents." 15 U.S.C. § 1381. To accomplish this purpose, Congress authorized federal regulation of auto safety while preserving state common law claims, thereby providing additional impetus to manufacturers to choose the best safety system for the particular car they are manufacturing. Rule 208 simply provides a "minimum standard for motor vehicle performance. . . ." 15 U.S.C. § 1391(2). It would defeat the purpose of the statute if manufacturers were not discouraged from utilizing a safety system that would otherwise be considered negligent under state common law tort theories.

Applying standard canons of statutory construction, we find that Congress expressed a clear intention to preserve common law claims from pre-emption through the savings provision of the Safety Act. 15 U.S.C. § 1397(k). When interpreting statutes, courts must first look to the plain language of the statute to divine intent. *United States v. Wright*, 48 F.3d 254 (7th Cir.1995). In ascertaining legislative intent, we presume that the legislature did not enact a useless provision. *Hinshaw v. Bd. of Comm'rs* (1993), Ind., 611 N.E.2d 637. When construing statutes, clauses related to the portion of the statute being construed must be considered and statutes are to be read as a whole. *Evansville v. Int'l Ass'n of Fire Fighters* (1987), Ind., 516 N.E.2d 57. "Just as a single word cannot be read in isolation, nor can a single provision of a statute." *Smith v.*

*United States,* 508 U.S. 223, 232, 113 S.Ct. 2050, 2056, 124 L.Ed.2d 138 (1995).

The § 1392(d) pre-emption clause represents a clear intention by Congress to pre-empt non-identical state regulation. However, the § 1397(k) savings clause—"[c]ompliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from liability under common law"—could not be more clear in expressing the intention of Congress to preserve state common law claims. Neither of these provisions can be read standing alone. Reading these two provisions together, state statutory and regulatory action that conflicts with the Safety Act is pre-empted, but all state common law claims are preserved. To read the savings clause in any other manner would be to nullify that provision.

We also look to the legislative history accompanying the passage of the Safety Act to understand that Congress did intend to preserve common law claims such as the one asserted in this case. Senator Warren Magnuson of Washington, the sponsor of the proposed Safety Act of 1966, stated, "[c]ompliance with Federal Standards would not necessarily shield any person from broad liability at the common law." 112 Cong.Rec. 14230 (1966). The Senate Committee Report also made it clear that the "[f]ederal minimum safety standards need not be interpreted as restricting State common law standards of care. Compliance with such standards would thus not shield any person from product liability at common law. The common law on product liability still remains as it was." S.Rep. No. 1301, 89th Cong., 2d Sess. 12 (1966) U.S.Code Cong. & Admin.Code 1966, pp. 2709, 2720. In addition, Representative John Dingell of Michigan stated, "We have preserved every single common-law remedy that exists against a manufacturer for the benefit of a motor vehicle purchaser." 112 Cong.Rec. 19633 (1966). While we acknowledge that arguments about the legislative history can be made to the contrary,[17] we believe these statements at least strongly support, if not establish, that Congress wanted to save common law claims from being pre-empted by the Safety Act.

In order to find implied pre-emption in the face of the Safety Act's statement of purpose, the presence of the savings clause, and the legislative history, the pre-*Cipollone* cases focussed instead on several "underlying purposes" behind the Safety Act and Rule 208 advanced by the auto industry, particularly (i) establishing uniform national safety standards and (ii) encouraging flexibility and choice among manual and passive restraints. *See, e.g., Pokorny,* 902 F.2d at 1122; *Heath,* 756 F.Supp. at 1147. While we find neither of these sufficiently persuasive to overcome the foregoing implied pre-emption analysis, we discuss each in turn.

The argument as to uniformity was first advanced in *Wood v. General Motors Corp.* where the majority found that a successful airbag claim "would stand as an obstacle to Congress's chosen *method* of increasing automobile safety"—uniform national safety standards. *Wood,* 865 F.2d at 412 (citing *International Paper Co. v. Ouellette,* 479 U.S. 481, 494, 107 S.Ct. 805, 813, 93 L.Ed.2d 883 (1987)). But this analysis was later rejected by the Third Circuit in *Pokorny v. Ford Motor Co.,* which persuasively argued that uniformity was not a primary goal of Congress, given that the Safety Act's purpose clause does not mention uniformity and, of course, the presence of the § 1397(k) savings clause which preserves common law liability. *Pokorny,* 902 F.2d at 1122. We only add that the regulatory scheme which has emerged from the NHTSA is anything but uniform, providing manufacturers three separate choices. Indeed, the suggested purpose of uniform national safety standards seems to us to be inherently contradictory to the purpose of encouraging flexibility and choice among manual and passive restraints.

The *Pokorny* court did find that a common law airbag claim would conflict, however, with the flexibility and choice that "Congress and the Department of Transportation intended to give to automobile manufacturers in this area." *Pokorny,* 902 F.2d at 1123. Its analysis, and that of the Eleventh Circuit in *Taylor v. General Motors Corp.,* was that the regulatory scheme authorized by the

---

**17.** *See Taylor,* 875 F.2d at 827 n. 19 and accompanying text.

Safety Act gives auto manufacturers the option of installing seat belts or airbags and that a common law rule "cannot prohibit the exercise of a federally granted option." *Pokorny*, 902 F.2d at 1124–25; *Taylor*, 875 F.2d at 827 (quoting *Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982)).

While we would probably dispute that a common law rule cannot prohibit the exercise of an option granted by federal regulation where, as in this case, the underlying federal statute contains an explicit common law savings clause,[18] we find it unnecessary to decide that issue here. Just as the *Pokorny* court did not find establishing uniform national standards to be Congress's primary purpose in enacting the Safety Act, neither do we find encouraging flexibility and choice to be a primary purpose. As noted above, Congress declared the Safety Act's purpose "to reduce traffic accidents and deaths and injuries to persons relating from traffic accidents." Congress thought that preserving common law claims would further that goal and included the § 1397(k) savings clause in the Act. Excising the effect of that provision from the Act in the name of providing manufacturers flexibility and choice in our view contradicts the primary purpose of the Act.

To reinforce our view in this regard, we observe that in 1984, *without any amendment to the Safety Act*, Rule 208 was amended to *require* passive restraints by phasing them in gradually between 1987 and 1990. While the 1984 version of Rule 208 is apparently not applicable in this case,[19] it illustrates that the NHTSA did not find flexibility to be so important an "underlying purpose" of the Safety Act that it was not authorized to substitute a more mandatory regime for the flexibility of its earlier regulatory scheme.

## C

After examining the stated purposes and policies of the Safety Act, the statutory language at issue, and the legislative and regulatory history, we are convinced that Congress was focussed first and foremost on "reducing traffic deaths and injuries and deaths and injuries to persons resulting from traffic accidents" and that its strategy was to pursue those purposes both through federal regulation and state common law. Because compliance with Rule 208 and recognition of plaintiff's claim here is not "physically impossible" and because recognition of the claim here does not stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"—indeed, we believe it furthers them—we find no basis for implying pre-emption of plaintiff's claim.

### *Conclusion*

We reject, as did the Court of Appeals, GM's argument that plaintiff's airbag claim is expressly pre-empted by the Safety Act. After a careful study of the United States Supreme Court decisions in *Cipollone* and *Myrick*, we hold that the § 1397(k) pre-emption clause entirely forecloses implied pre-emption in this case and permits plaintiff's airbag claim to go forward. And even if we apply the principles of implied pre-emption analysis as re-stated in *Myrick*, we conclude that it would be improper to imply pre-emption here.

We grant transfer, vacate the opinion of the Court of Appeals, reverse the trial court's grant of summary judgment in favor of GM, and remand to the trial court for further proceedings consistent with this opinion.

SHEPARD, C.J. and DeBRULER, J., concur.

DICKSON, J., concurs in part and concurs in result with separate opinion.

SELBY, J., concurs in part and concurs in result with separate opinion to follow.

DICKSON, Justice, concurring in part and concurring in result.

Except as to Part V, I concur in the majority opinion. Unlike the majority, I would not

---

18. The underlying statute in *de la Cuesta*, the Home Owners' Loan Act of 1933, 12 U.S.C § 1464(a), did not contain a savings clause.

19. Mr. Wilson's car was a 1986 Chevrolet and the 1984 version of Rule 208 was applicable through the 1986 model year.

"hold that the § 1397(k) preemption clause entirely forecloses any possibility of implied preemption in this case." Opinion at 336. The United States Supreme Court in *Myrick* was faced with the same statute—with the same preemption clause and savings clause— that is before us in the present case. Rather than disposing of the issue by declaring implied preemption to be foreclosed, the *Myrick* majority in fact performed an implied preemption analysis, concluding that compliance with both federal and state law was not impossible and that the lawsuit did not frustrate congressional objectives. *Freightliner Corp. v. Myrick* (1995), —— U.S. ——, ——, 115 S.Ct. 1483, 1487, 131 L.Ed.2d 385. That the *Myrick* court expressly conducted such an analysis leads me to conclude that we must do likewise. Thus, while I agree with the majority's implied preemption analysis in Part VI, I do not join in its introductory comment that such analysis "is not required." Opinion at 336.

SELBY, Justice, concurring in part and concurring in result.

I concur in the result because to hold otherwise would be to render the saving clause meaningless.

The *Myrick* Court did not engage in analysis to determine whether § 1397(k) actually forecloses implied preemption analysis. Because the federal standard in that case had been suspended, there was no federal statute available to preempt the state common law. Thus, the *Myrick* Court jumped immediately to the implied preemption issue, found that there was no preemption, and easily disposed of that case. The same end result would have been reached regardless of whether the Court had analyzed § 1397(k) to determine if implied preemption analysis is appropriate for this statute. Thus, from *Myrick*, it is not clear that implied preemption analysis is required. All that is clear is that such analysis is permitted.

The majority opinion hinged its decision on the express language of the saving clause. A saving clause generally does not create law, but rather preserves prior law from nullification. A statute and its saving clause are to be considered together in order to ascertain legislative intent. A saving clause ordinarily must be construed as not to include anything not fairly within its terms. Moreover, since there is a presumption against preemption, it is fair to consider this common law remedy to be within the bounds of the saving clause. Therefore, I agree that the common law remedy is not preempted by this statute.